UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHARLES STANDISH,

               Plaintiff,

      -vs-

**DECISION and ORDER
No. 6:15-cv-6226(MAT)**

FEDERAL EXPRESS CORPORATION LONG
TERM DISABILITY PLAN and AETNA LIFE
INSURANCE COMPANY,

               Defendants.

_____

## INTRODUCTION

Represented by counsel, Charles Standish ("Plaintiff" or "Standish"), a former employee of Federal Express Corporation ("FedEx") brings the present action against Federal Express Corporation Long Term Disability Plan ("LTD Plan" or "the Plan") and Aetna Life Insurance Company ("Aetna") (collectively, "Defendants"), pursuant to § 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), challenging the denial of his claim for long term disability ("LTD") benefits.

## PROCEDURAL HISTORY

Plaintiff was employed as a DOT/Courier for FedEx, which required the ability to drive a commercial vehicle and a special license. As a permanent full-time emplyee of FedEx who had worked longer than 180 days, Standish was a Covered Employee under the LTD

Plan, and was entitled to a Disability Benefit if he became Disabled as defined in the LTD Plan.

In 2000, Standish was diagnosed with a thalamic tumor, and was treated for hydrocephalus with the placement of a shunt. When the first shunt failed in November 2011, he developed acute obstructive hydrocephalus and underwent surgery to have a second shunt implanted on November 27, 2011.  The second shunt failed, and an external drain was placed on December 3, 2011. As a result of the shunt failures, Plaintiff developed bilateral deep vein thrombosis ("DVT") and suffered one seizure. His condition necessitated placement of a vena cava filter on December 17, 2011. On December 21, 2011, his surgeon placed a new shunt. Based on these medical conditions, Plaintiff applied for and received short-term disability benefits under the Federal Express Short Term Disability Plan ("STD Plan") from December 5, 2011, through June 3, 2012.

After Plaintiff exhausted his short-term disability benefits, he applied for and received long-term disability benefits under the LTD Plan based on his being found to have an Occupational Disability, meaning that his medically-determinable impairments rendered him unable to perform the duties of his regular occupation. Plaintiff received Occupational Disability benefits from June 4, 2012, through June 3, 2014.

Prior to the expiration of his Occupational Disability benefits, Plaintiff applied for Total Disability benefits under the

LTD Plan, which required him to show that he was unable to engage in any compensable employment for 25 hours per week. By letter dated December 4, 2013, Aetna notified him that it was reviewing his claim. On March 24, 2014, Plaintiff's claim for benefits was referred to board-certified neurologist Kenneth Root, M.D., for a peer review of the clinical data in Plaintiff's file. Dr. Root concluded that there was "no objective clinical documentation demonstrating significant neurological functional impairment which would preclude the claimant from engaging in any employment for a minimum of 24 hours per week." (AR 00118-119). Aetna denied Plaintiff's claim on May 22, 2014, stating, in part, that there were "insufficient objective findings to support a Total Disability from any occupation." (AR 00007).

Standish appealed the denial of his claim for Total Disability benefits and, between May 23, 2014, and July 3, 2014, he submitted additional information to Aetna in support of his claim.

On June 12, 2014, Aetna referred Plaintiff's claim to Steven Swersie, M.D. for an internal medicine peer review of the clinical data in Plaintiff's file. Dr. Swersie reviewed the file and conducted peer-to-peer consultations with several of Plaintiff's medical providers. Dr. Swersie's conclusion was favorable to Plaintiff: He found that although Plaintiff was neurologically stable, there did appear to be sufficient objective clinical evidence to support the presence of a functional impairment

precluding him from engaging in any compensable employment for a minimum of 25 hours a week for the period from June 4, 2014, to July 19, 2014. (AR 00123).

Apparently dissatisfied with Dr. Swersie's opinion, on July 11, 2014, Aetna requested that Dr. Elana Mendelssohn, a board-certified clinical psychologist and neuropsychologist, conduct another peer review of Plaintiff's clinical file. Dr. Mendelssohn, who was instructed by Aetna *not* to conduct any peer-to-peer consultations with Plaintiff's medical providers, found that the file "did not include significant objective clinical documentation that reveals a functional impairment that would preclude the claimant from engaging in any compensable employment for a minimum of 25 hours a week from 6/4/14 to present." (AR 00145).

On August 4, 2014, Aetna notified Plaintiff that its Appeal Review Committee ("the Committee") had voted to uphold the denial of his claim for Total Disability benefits. The denial letter acknowledged that Plaintiff had been awarded disability insurance benefits ("DIB") by the Social Security Administration ("SSA") but distinguished the award on the basis that the criteria used by the LTD Plan and the SSA were different. (AR 00003).

Plaintiff then timely commenced this action. The parties have filed competing motions for summary judgment on the administrative record. Plaintiff seeks judgment in his favor awarding benefits and does not appear to request, in the alternative, reversal of the

-4-

denial of benefits and remand. Plaintiff's motion for summary judgment to the extent he seeks an award of benefits is denied because there are issues of fact that preclude such an award at this juncture. Defendants similarly are not entitled to summary judgment due to procedural violations of ERISA. Therefore, the Court finds that the appropriate remedy is to reverse the denial of LTD benefits and to remand the matter to Aetna for further administrative proceedings consistent with this opinion.

**DISCUSSION**

I.   **The Appropriate Standard of Review: <u>De Novo</u> or Deferential**

A.   **General Legal Principles**

A plan administrator's "denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). However, "[w]here the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" <u>Kinstler v. First Reliance Standard Life Ins. Co.</u>, 181 F.3d 243, 249 (2d Cir. 1999) (quoting <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 442

(2d Cir. 1995) (citation and internal quotation marks omitted in Kinstler; other citation omitted).

Here, Plaintiff claims that the deferential arbitrary-and-capricious review standard should not apply because Aetna was not properly appointed with fiduciary authority under the Plan to conduct the administrative appeal review of the denial of his claim. It is necessary at the outset to review in some detail several provisions of various iterations of the Plan, as well as the decision-making roles of several entities, namely, (1) the Administrator, (2) the Committee, (3) the Claims Paying Administrator, and (4) the appeal committee.

### B.   Relevant Entities Under the Plan

The Plan designates FedEx as the "Administrator . . . charged with the administration of the Plan, acting through its Employee Benefits Department." Plan, § 1.1(a) (AR 00529). Article 6 states that "[t]he Administrator is a named fiduciary of the Plan and shall have the absolute right and power to construe and interpret the provisions of the Plan and administer it for the best interest of Employees[,]" Plan, § 6.1 (AR 00585), including the ability "to construe any ambiguity and interpret any provision of the Plan or supply any omission or reconcile any inconsistencies in such manner as it deems proper." Id. In addition, the Administrator's "authority shall include, but shall not be limited to" "determin[ing] eligibility for coverage under the Plan in

accordance with its terms" and "decid[ing] all questions of eligibility for, and determin[ing] the amount, manner and time of payment of, benefits under the Plan in accordance with its interpretation of its terms." Plan, § 6.1(b), (c) (AR 00585). The Plan further provides that "[t]he determination of the Administrator shall be made in a fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only to a determination by a court of competent jurisdiction that the Administrator's decision was arbitrary and capricious." Plan, § 6.1 (AR 00585).

Notwithstanding the Plan's appointment of FedEx to serve as the Administrator, the Plan further provides for the appointment, by the FedEx Board of Directors, of an entity it refers to as "the Committee." The Committee, whose composition is not described by the Plan, is given the authority "to perform the administrative duties [under the Plan]" and to assume "general administrative power" over the Plan and "with such other powers as may be necessary to perform its duties hereunder," apart from the specific functions of claims administration. See Plan, § 6.2. In addition to vesting the Committee with general administrative power, the Plan make the Committee "a named fiduciary of the Plan."

The Plan specifically designates Aetna "or any other entity or person designated as such by the Company" as the "Claims Paying Administrator," Plan, § 1.1(e) (AR 00530), and it provides that

-7-

"the administration of claims . . . is the responsibility of the Administrator and the Claims Paying Administrator to the extent such duties are delegated to it by the Administrator." Plan, § 6.2 (AR 00586-587). The Plan describes the procedure for an employee who is seeking disability benefits to file a claim with the Claims Paying Administrator, and for the Claims Paying Administrator to grant or deny the claim. See Plan, § 5.1 (AR 00570-571).

### 4.    The Appeal Committee

The Plan further provides that the "Administrator shall appoint an appeal committee for the purpose of conducting reviews of denial of benefits and providing the claimant with written notice of the decision reached by such committee." Plan, § 5.3(c) (AR 00577).  Upon its receipt of a notice for a request for a review, "the appeal committee shall review the claim and shall make a decision no later than  45 days following the Claims Paying Administrator's receipt of a request for review, unless special circumstances require an extension· of time for processing. (Id.).

### C.    Relevant Plan Language

### 1.    Plan Language Prior to the Second Amendment

The LTD Plan states that

> [t]he appeal committee, appointed pursuant to Subsection (c) [of Section 5.3], shall, subject to the requirements of the Code and ERISA, be empowered to interpret the Plan's provisions in its sole and exclusive discretion in accordance with its terms with respect to all matters properly brought before it pursuant to this Section 5.3, including, but not limited to, matters relating to the eligibility of a claimant for benefits under the Plan.

-8-

> The determination of the appeal committee shall be made in a fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only to a determination by a court of competent jurisdiction that the committee's decision was arbitrary and capricious.

(AR 00579-580). Section 5.3(c) in turn provides that "[t]he Administrator shall appoint an appeal committee for the purpose of conducting reviews of denial of benefits and providing the claimant with written notice of the decision reached by such committee." (AR 00576).

### 2.   Language After the Second Amendment

The Plan was amended in January of 2013, by means of a Second Amendment stating that "the Plan is hereby clarified as follows, effective September 1, 2008[.]" (AR 00502), to include the following language:

> The Claims Paying Administrator *shall*, subject to the requirements of the Code and ERISA, *be empowered to interpret the Plan's provisions in its sole and exclusive discretion* in accordance with its terms with respect to all matters properly brought before it pursuant to this Section 5.3, *including but not limited to, matters relating to the eligibility of a claimant for benefits under the Plan*. The determination of the Claims Paying Administrator shall be made in a fair and consistent manner in accordance with the Plan's terms and *its decision shall be final, subject only to a determination by a court of competent jurisdiction that the individual's or committee's decision was arbitrary and capricious*.

Second Amendment to the Federal Express Corporation Long Term Disability Plan § 5.3(d) (AR 00502-503) (emphases supplied).

-9-

D.    **The Relevant Date for Determining which Version of the Plan Applies**

While the Second Amendment states that it became effective September 1, 2008 (see AR 00502 (stating that "the Plan is hereby clarified as follows, effective September 1, 2008. . ."), both parties assert that the Second Amendment became effective in January of 2013. (See Dkt #39, p. 3 of 40; Dkt #40, p. 6 of 21). For purposes of deciding the motions for summary judgment, the Court will use January 2013 as the effective date of the Second Amendment.

Plaintiff asserts that the relevant date for determining which version of the Plan applies is the date his entitlement to LTD benefits allegedly commenced, i.e., June 4, 2012 (see Dkt #39, p. 4 of 40). This date is prior to the January 2013 effective date of the Second Amendment (as stated by the parties), meaning that the Second Amendment would not apply to his claim. Defendants argue that the relevant date that Aetna made its final decision on Plaintiff's claim, i.e., August 4, 2014 (see Dkt #40, pp. 6 & 12 of 21; citations to record omitted). The caselaw consulted by the Court indicates that the relevant date is the date of the final disability determination, August 4, 2014. See Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 194-95 (3d Cir. 2002) (citing Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1159 (9th Cir. 2001)). In Smathers, the plan at issue was amended on February 1, 1998, to

give discretion to the administrator. This was after the injury occurred (August 24, 1997), and after the initial claims were made (prior to January 22, 1998), but before the administrator made its determination (January 29, 1999). Smathers, 298 F.3d at 195. The district court relied on the amended plan because it was in effect when the administrator considered and then denied the plaintiff's claim for benefits. Id. The plaintiff argued that he had a vested right to have his claim reviewed based on the earlier plan, and therefore, that "right" could not be retroactively denied. Id. The Third Circuit disagreed, noting that along with its sister circuits, it had "spoken of the retroactive denial of 'rights' only in a narrow factual setting where the occurrence of an accident or other event resulted in the vesting of coverage or benefits prior to an amendment affecting the person's *substantive* rights under the plan." Id. (collecting cases; emphasis supplied). In Smathers, the amendment to the plan did not alter the coverage under the plan, the substance of the plaintiff's benefits, or his entitlement to them; instead, it simply changed the scope of the administrator's discretion and authority.   Id. Because the issue in Smathers involved was "the administrator's discretionary authority to make the benefits determination," the Third Circuit "conclude[d] that the better approach [was] to look at the plan in effect on the date the administrator actually made that determination." 298 F.3d at 196 (citing Grosz-Salomon v. Paul Revere Life Insurance Co., 237

F.3d 1154, 1159, 1160-61 (9th Cir. 2001) ("[A]n employee's rights under an ERISA welfare benefit plan do not vest unless and until the employer says they do. Nothing in Reznik's policy with Paul Revere assured employees that their rights were vested. On the contrary, the policy provided that Paul Revere could change the group policy upon written request from the policyholder and that the insured's consent was not needed to make a policy change. That [Grosz-Salomon] became permanently disabled and filed her disability claim while the first policy was in effect is irrelevant; it does not entitle her to invoke that plan's provisions in perpetuity. . . . Because no employees' rights were vested, Reznik was at liberty to change its long-term disability plan. It did so in October 1993. Because Grosz–Salomon's cause of action accrued several years later, in December 1997[, when Paul Revere concluded she was not disabled], this court must look to the revised plan to determine the appropriate standard of review.") (citing McGann v. H & H Music Co., 946 F.2d 401, 403, 405 (5th Cir. 1991); Podolan v. Aetna Life Ins. Co., 107 F.3d 17, 1997 WL 51667 (9th Cir. 1997); Blessing v. Deere & Co., 985 F. Supp. 899, 902-03 (S.D. Iowa 1997)). As in Grosz–Salomon, nothing in the Plan assured employees that their rights were vested; instead, Section 7.1 of the Plan has, at all relevant times, stated that

> [t]he Sponsoring Employers *shall have the right at any time to modify, alter or amend the plan in whole or in part* by an instrument in writing duly executed by officers of each of the Sponsoring Employers or as

> reflected in the minutes of FedEx Corporation's board of
> directors or any committee thereof or as reflected in the
> minutes of the Committee. . . . Such amendment shall be
> binding on all persons interested in the Plan.

Federal Express Corporation Long Term Disability Plan, § 7.1 (AR 00589). Furthermore, as in Grosz-Salomon, the insured's consent was not needed to make a change or amendment to the Plan.  This Court finds the analyses in Smathers and Grosz-Salomon persuasive. Because neither Standish's right to disability benefits were not vested under the Plan, FedEx was at liberty to change the Plan, which it did in January 2013, by means of the Second Amendment. Standish's claim accrued approximately a year and eight months later, in August 2014. Therefore, following Smathers and Grosz-Salomon, the Court will rely on the Second Amendment to determine the appropriate standard of review.

### E.   The Granting of Discretionary Authority to Aetna

As noted above, Second Amendment to the Plan states in relevant part that

> [t]he Claims Paying Administrator *shall*, subject to the
> requirements of the Code and ERISA, *be empowered to
> interpret the Plan's provisions in its sole and exclusive
> discretion* in accordance with its terms with respect to
> all matters properly brought before it pursuant to this
> Section 5.3, *including but not limited to, matters
> relating to the eligibility of a claimant for benefits
> under the Plan*.

According to Standish, the above-quoted language does not sufficiently confer discretion on Aetna because "[e]mpowering

someone is not the same as a clear 'grant of discretion.'" (Dkt #25, p. 22). The Court disagrees.

The District of Columbia Circuit Court of Appeal observed in Block v. Pitney Bowes Inc., 952 F.2d 1450 (D.C. Cir. 1992), that the Supreme Court in Firestone "surely did not suggest that 'discretionary authority' hinges on incantation of the word 'discretion' or any other 'magic word.' Rather, the Supreme Court directed lower courts to focus on the breadth of the administrators' *power*—their 'authority to determine eligibility for benefits or to construe the terms of the plan.'" Id. at 1453 (quoting Firestone, 489 U.S. at 115; emphasis supplied); citing de Nobel v. Vitro Corp., 885 F.2d 1180, 1187 (4th Cir. 1989)). In de Nobel, for instance, the ERISA-governed retirement plan stated that "the [c]ommittee shall have such powers as may be necessary to carry out the provisions of the [p]lan and to perform its duties hereunder, including, without limiting the generality of the foregoing, the power:  (e) To determine all benefits and resolve all questions pertaining to the administration, interpretation and application of [p]lan provisions . . . ." de Nobel, 885 F.2d at 1186 (quotation omitted). The beneficiaries argued that this broad language failed to confer on the committee the "discretion" to resolve benefits eligibility disputes or to interpret provisions of the plan because the word "discretion" itself appeared nowhere in the plan documents. Id. The Fourth Circuit rejected this argument

-14-

as "semantic hairsplitting[,]" id. at 1187, noting that it "need only appear on the face of the plan documents that the fiduciary has been 'given [the] *power* to construe disputed or doubtful terms'—or to resolve disputes over benefits eligibility—in which case 'the trustee's interpretation will not be disturbed if reasonable.'" Id. (quoting Firestone, 489 U.S. at 115; emphasis and brackets in original). See also, e.g., Campbell v. Chevron Phillips Chem. Co., L.P., 587 F. Supp. 2d 773, 788 (E.D. Tex. 2006) ("To confer discretionary authority, a plan should, at the very least, convey that the plan administrator is empowered to construe, to interpret, or to otherwise exercise discretion in determinations of plan members' eligibility for benefits.") (citing, inter alia, Tolson v. Avondale Indus., Inc., 141 F.3d 604, 607 (5th Cir. 1998) (ERISA plan conferred discretionary authority where it stated that the review committee had "sole and exclusive discretion and power to grant and/or deny any and all claims for benefits, and construe any and all issues of [p]lan interpretation and/or facts or issues relating to eligibility for benefits")). Based on all of this precedent, the Court easily concludes that the language of Section 5.3, as set forth in the Second Amendment, vests in the Plan's fiduciaries "a sufficient measure of discretionary authority to preclude de novo review of benefits determinations." de Nobel, 885 F.2d at 1187 (citing Boyd v. United Mine Workers Health & Retirement Funds, 873 F.2d 57, 59 (4th Cir. 1989) (plan provisions

giving administrators "the power of 'full and final determination as to all issues concerning eligibility for benefits'" and the authority "'to promulgate rules and regulations to implement [the p]lan'" left "no question that the [t]rustees . . . ha[d] discretionary authority")). Accordingly, the Court must apply the deferential "abuse of discretion" standard to the denial of Standish's claim for LTD benefits. See Firestone, supra.

## II. Alleged Inconsistencies in the Plan's Standard Requiring Objective Findings

The Plan defines the terms "Disabled" and "Disability" as

either an Occupational Disability or a Total Disability; provided, however, that a Covered Employee shall not be deemed to be Disabled or under a Disability unless he is, during the entire period of Disability, under the direct care and treatment of a Practitioner and such Disability is substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms. In the absence of significant objective findings, conflicts with managers, shifts and/or work place setting will not be factors supporting Disability under the Plan.

Plan, § 1.1(e) (AR 00532-533). The Plan, under "Proof of Disability," provides that

[n]o Disability Benefit shall be paid under the Plan unless and until the Claims Paying Administrator has received an application for benefits and information sufficient for the Claims Paying Administrator to determine pursuant to the terms of the Plan that a Disability exists. . . . Such information may, as the Claims Paying Administrator shall determine, consist of a certification from the Covered Employee's attending

       Practitioner, in the form prescribed by the Claims Paying Administrator, information in the form of personal references, narrative reports, pathology reports, x-rays and any other medical records or other information as may be required by the Claims Paying Administrator.

Plan, § 5.1 (AR 00570).

Plaintiff argues that the requirement of "significant objective findings," Plan, § 1.1(e) in the Plan's definition of Disability is a "moving target" that conflicts with the Plan's provision regarding Proof of Disability, which does not refer to "significant objective findings," Plan, § 5.1, and thus is more generous to claimants. However, as Defendants argue, the Proof of Disability sets forth the form of the "information" that can be submitted to the Claims Paying Administrator in support of a claim for benefits. Regardless of what form the "information" takes, it must "be sufficient for the Claims Paying Administrator to determine pursuant to the terms of the Plan that a Disability exists," which, as stated in Section 1.1(e), must be based on "significant objective findings." Admittedly, it is difficult to conceive of how "personal references," as an acceptable form of Proof of Disability, could be sufficiently "significantly objective" to establish a Disability. While the language of the Plan in the Proof of Disability section is not a model of clarity, the Court cannot find that the Proof of Disability provision is irreconcilably in conflict with the Plan's definition of Disability.

-17-

### III. Procedural Violation of ERISA: Inadequacy of the Denial Letter

"ERISA mandates that specific reasons for the denial of benefits be communicated to the claimant." <u>Schneider v. Sentry Grp. Long Term Disability Plan</u>, 422 F.3d 621, 627 (7th Cir. 2005) (citing 29 U.S.C. § 1133). In addition, the regulations promulgated pursuant to ERISA and in force at the time the denial letters were sent, provide that the notification of an adverse benefit determination

> shall set forth, in a manner calculated to be understood by the claimant-
>
>> (I) The specific reason or reasons for the adverse determination;
>> (ii) Reference to the specific plan provisions on which the determination is based;
>> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
>> (iv) A description of the plan's review procedures and the time limits applicable to such procedures . . .

29 C.F.R. § 2560.503-1(g).

Plaintiff argues that Aetna's initial denial letter, issued on May 22, 2014 (AR 00006-8), was not legally sufficient because it did not contain a description of the additional material or information that Aetna deemed necessary to perfect his disability claim, and an explanation as to why such material or information was necessary. Plaintiff in particular points to the report by peer-review physician Dr. Root indicating what tests proof would have been helpful to him (Dr. Root) in evaluating Plaintiff's claim

more comprehensively; Plaintiff argues that Aetna should have included these comments by Dr. Root in the denial letter. The pertinent portion of Dr. Root's report (AR 00112-115), reads as follows:

> Based upon the documentation provided, this consulting neurological reviewer is of the opinion the claimant *is neurologically impaired, but is not quite certain as to what degree*. The recent documentation does not support objective neurologic functional impairment in the claimant which would preclude him from engaging in any compensable employment for a minimum of 25 hours a week. When Dr. Wensel evaluated the claimant, he did not perform a detailed mental status evaluation and the mental status exam performed in the office is limited, [and was] reported as unremarkable or normal as given. The memory impairment is self-reported or claims to be a problem with the history provided by his wife which is relayed in the records by Dr. Wensel. No other focal or lateralizing deficits are reported by Dr. Wensel, nor anytime by Dr. Kingston, the claimant's neurologist. Dr. Kingston last saw the claimant 11/20/12, yet continues to complete Attending Physician Statements and answer questions regarding the claimant's status without apparently knowing his present clinical status. *There are no reports of any recent updated clinical neurological evaluations, neurologic or neurosurgical testing, and no reevaluation of the claimant's neuropsychological status.*

> This reviewer is left with the conclusion therefore, the claimant is not totally disabled and is capable of working any occupation 25 hours per week. *This reviewer would recommend there be a complete reevaluation of the claimant's neurologic and neuropsychological condition for documentation purposes and to be able to hopefully evaluate the claimant's complete functional abilities and capacity.*

> The opinion above is based on the information available for review and held to a reasonable degree of clinical certainty.

(AR 00115) (emphases supplied). Plaintiff characterizes the italicized language in the excerpt above as a "request" for

additional information by Dr. Root that Aetna had a "legal and fiduciary responsibility to deliver" to Plaintiff. (See Dkt #38, p. 16 of 31).

Aetna counters that the denial letter in question, dated May 22, 2014 (AR 00006-8), contained all of the information required under 29 C.F.R. § 2560.503-1(g) and explained that Plaintiff had failed to submit "significant objective findings" which were needed to substantiate a claim for total disability under the Plan. Aetna employee, Elizabeth Thompson, STD Claims Analyst ("Thompson"), informed Plaintiff in relevant part as follows:

> I have reviewed your file in full. In addition, to afford you every consideration, a neurology peer physician [i.e., Dr. Root] also reviewed all the clinical data. It has been determined that there are insufficient objective findings to support a Total Disability from any occupation. Specifically, on 01/30/2014 Dr. Wensel did not perform a detailed mental status evaluation and the mental status examination performed in the office was limited, being reported as unremarkable or normal. Your memory impairments were self-reported. Also, no other focal or lateralizing deficits were reported by Dr. Wensel. You had an appointment with Dr. Kingston, Neurology on 11/20/2012, however, there were no detailed physical exam findings or any documentation of neurological deficits. There were no neurological evaluations, neurosurgical testing results or documentation of significant neurological abnormalities to prevent you from engaging in any compensable occupation for a minimum of twenty five (25) hours a week. The clinical documentation dated 03/14/14 indicated improvement, and your functional ability to perform day-to-day activities including driving. You stated complaints of memory issues, however, Dr. Long did not performed any detailed mental status examination. Also, there is no evidence of any significant findings to indicate your inability to sit, ambulate, stand, walk or

> lift up to 10 pounds occasionally, lf necessary. As a result of the above review, it has been determined that there are no significant objective findings to support a Total Disability that would prevent you from engaging in any compensable employment for a minimum of twenty-five hours a week in a sedentary position.

(AR 00007). A comparison of Dr. Root's report with Aetna's May 22, 2014, denial letter reveals that Aetna  did not merely state that there were "insufficient objective findings" in the file, which would have been inadequate notice, but also "[s]pecifically" pointed to  the various deficits in objective medical evidence found by Dr. Root during his review of the file. However, the Court finds that the notice letter does not comply with the portion of the regulation which requires "[a] *description of any additional material or information necessary* for the claimant to perfect the claim and an *explanation* of why such material or information is necessary." 29 C.F.R. § 2650.503-1(g) (emphases supplied). Rather than specifically describing the types of objective medical evidence that Dr. Root found lacking, the letter gives a vague description as to what "data . . . may assist [Aetna] in [its] determination," and provides a non-exclusive list as follows: physician exam reports, office notes, progress notes, other healthcare provider reports, and diagnostic test results, i.e. lab tests, radiographic tests. (AR 00007). However, Plaintiff reasonably could have concluded that he had such items already in his file, since he had, for instance, submitted multiple office notes and progress notes from various healthcare providers. It is

not sufficient that an attorney perhaps might have divined from Aetna's letter the particular types of data Aetna required, and might have inferred that, as a next step in perfecting his claim, it was necessary for Plaintiff to ask Dr. Wensel to "perform a detailed mental status evaluation," or ask Dr. Kingston to make "detailed physical exam findings or [a] documentation of neurological deficits," or ask any one of his treating physicians to perform "neurological evaluations, [or] neurosurgical testing." However, the standard imposed by ERISA requires that a plan administrator's notice letter be "written in a manner calculated to be understood by *the participant*[.]" 29 U.S.C. § 1133(1) (emphasis supplied). The notice letter here was not so written.

"Violation of ERISA and its implementing regulations has been held to constitute 'a significant error on a question of law[.]'" Cook v. N.Y. Times Co. Long-Term Disability Plan, No. 02 CIV. 9154(GEL), 2004 WL 203111, at *6 (S.D.N.Y. Jan. 30, 2004) (quoting VanderKlok v. Provident Life and Acc. Ins. Co., Inc., 956 F.2d 610, 616 (6th Cir. 1992); Omara v. Local 32B-32-J Health Fund, No. 97 Civ. 7538, 1999 WL 184114, at *4 (E.D.N.Y. Mar. 30, 1999)). Such violations may "sufficiently taint [the fiduciary's] denial of [benefits] so as to warrant a finding that [the denial] was arbitrary and capricious." Veilleux v. Atochem N. Am., Inc., 929 F.2d 74, 76 (2d Cir. 1991). Here, the Court finds that the May 22, 2014, denial letter not only was procedurally defective, but it

-22-

points out at least one significant way in which Aetna's decision-making was materially deficient due to the notice violation. As noted above, Dr. Root pointedly informed Aetna that Plaintiff's file lacked various items of important information that he felt were necessary for him to review, namely, "recent updated clinical neurological evaluations, neurologic or neurosurgical testing." Then, after offering his opinion, Dr. Root completely undermined the validity of that opinion by "recommend[ing] a reevaluation of [Plaintiff]'s neuropsychological status a conclusion and capacity . . . to be able to *hopefully evaluate*" Plaintiff's "*complete* functional abilities and capacity." The only reasonable inference to be drawn from these statements is that Dr. Root's opinion does not, and could not, represent an evaluation of Plaintiff's "*complete* functional abilities and capacity," because he found that Plaintiff's claims file was inadequate and incomplete. Furthermore, the procedural deficiencies in the May 22, 2014 letter were not cured by subsequent correspondence from Aetna. See Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 693 (7th Cir. 1992) ("Nor are the defects cured by the later correspondence. With respect to this correspondence, we note that the regulations require that the denial letter itself contain specific reasons. Even if we assume that subsequent letters sent by an administrator can remedy deficiencies in a denial letter and amount to substantial compliance with the regulation, this second letter is also

inadequate.") (internal citation omitted); see also Cook v. N.Y. Times Co. Long-Term Disability Plan, No. 02 CIV. 9154 (GEL), 2004 WL 203111, at *16 (S.D.N.Y. Jan. 30, 2004) (ERISA's regulations "apply equally to all 'notification[s] of benefit determination on review' and do not distinguish among levels of appeal. See 29 C.F.R. § 2560.503-1(j). Second, the requirement of a full and fair review on the first go-round should apply no less simply because an administrator grants an additional level of appeal: a second appeal that does nothing to cure the procedural deficiencies of the first will not constitute substantial compliance merely by virtue of its existence.") (brackets in original).

## IV.  The Proper Remedy is Remand

For the foregoing reasons, Defendants are not entitled to summary judgment  affirming the denial of LTD benefits under the plan.

Plaintiff asserts that he is entitled to judgment in his favor awarding benefits. Courts have explained, however, that the remedy for the type of fiduciary failures that have occurred here is "'not automatic entry of judgment in favor of the insured—in effect treating [the] defendant's noncompliance as a ground for default—but rather, an opportunity for the insured to fully and fairly present his or her claim.'" Cook, 2004 WL 203111, at *19 (quoting George v. First Unum Life Ins. Co., No. 93 Civ. 2916, 1995 WL 231254, at *2 & n. 3 (S.D.N.Y. Apr. 18, 1995)). "The normal

procedure for review of ERISA denials that have been found arbitrary and capricious is remand to the fiduciary for a new eligibility determination." Cook, 2004 WL 203111, at *19 (citing Wolfe v. J.C. Penney Co., Inc., 710 F.2d 388, 393 (7th Cir. 1983); other citations omitted). While the present record contains a fair amount of evidence in Plaintiff's favor, it is not uncontroverted. Absent the Court's finding of procedural violations, the opinions by Aetna's peer-review physicians (excepting Dr. Swersie) likely would represent evidence sufficient to uphold the determination on arbitrary and capricious review. The various medical opinions also present disputed genuine issues of material fact. Cook, 2004 WL 203111, at *19 (citing Omara, 1999 WL 184114, at *4 ("The Court cannot conclude at this time, based on the record, that Plaintiff has established his entitlement to benefits as a matter of law."); other citation omitted). Therefore, the Court will not enter judgment in Plaintiff's favor. Accord, e.g., Cook, 2004 WL 203111, at *19; George, 1995 WL 231254, at *2 & n. 3 (denying summary judgment in claimant's favor where, although administrator defendant did not comply with the procedures prescribed by ERISA and the regulations, court could not find that denial of application was sufficiently arbitrary to warrant awarding benefits under the terms of the policy).

Accordingly, the case will be remanded to Aetna, the Claims Paying Administrator, for reconsideration. Aetna shall consider any

further information Plaintiff submits within a reasonable time following this Decision and Order. During this review, Aetna is expected to comply with ERISA's requirements for full and fair review in reaching its determination, including the requirement that it "does not afford deference to the initial adverse benefit determination." 29 C.F.R. § 2560.503-1(h). Likewise, if Plaintiff's claim is unsuccessful initially, the Appeal Committee is held to compliance with these same standards in reviewing any claim on appeal.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied. Plaintiff's Motion for Summary Judgment is granted only to the extent that the denial of LTD benefits is reversed, and the matter is remanded to Aetna for further administrative proceedings consistent with this opinion.

**SO ORDERED.**

Honorable Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     November 17, 2016
           Rochester, New York